UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NORMAN ROBERTS, on behalf of himself and all those similarly situated,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>NAVIOS MARITIME HOLDINGS, INC., ANGELIKI N. FRANGOU, SPYRIDON MAGOULAS, GEORGE MALANGA, JOHN STRATAKIS, and SHUNJI SASADA,<br><br>　　　　　　Defendants. | Case No. _____<br><br><br><br>**JURY TRIAL DEMANDED** |

## STOCKHOLDER CLASS ACTION COMPLAINT

Plaintiff Norman Roberts ("Plaintiff"), by and through his undersigned counsel, brings this Stockholder Class Action Complaint against Navios Maritime Holdings, Inc. ("NMH" or the "Company") and certain of its directors (the "Director Defendants"). Plaintiff alleges the following based upon knowledge as to himself, and upon information and belief, including the investigation of Plaintiff's counsel and review of publicly available information, as to all other matters. Plaintiff hereby demands a trial by jury.

## NATURE OF THE ACTION

1. This case arises because Angeliki Frangou ("Frangou"), a corporate Chairwoman, CEO, and controller who recently had her bank accounts frozen as part of a vast criminal investigation, is desperate to extract cash from the Company she controls. Frangou's problem is that NMH has two classes of preferred shares held by the public as American depositary shares ("ADS") that are currently entitled to receive the first $28 million worth of the Company's

dividends.  Frangou, who only holds common shares, will not be able to get any dividends herself unless the ADS are first made whole or the ADS holders waive their priority rights to NMH's cash.

2.       Facing a personal liquidity crisis and potential criminal liability, Frangou has decided to manipulate the tools of corporate power to engage in coercive and disloyal conduct. After starving ADS of dividends for the past twelve quarters, Frangou and her loyalists on the Navios Board are improperly coercing the ADS holders into giving up their right to receive accrued but unpaid dividends.  Specifically, they combined a tender offer for the outstanding ADS at a fraction of the unpaid dividends with a consent solicitation to amend the terms of any ADS that are not tendered to eliminate substantially all their rights in the future (the "Consent Solicitation"). By tying the tender offer to the Consent Solicitation, Frangou and the Board are forcing ADS holders to make a decision that has nothing to do with the economic value of the offer – tender and thereby accept less than the unpaid dividends or risk losing all protections going forward, including the right to receive accrued dividends.  In other words, they created a classic prisoner's dilemma: collectively, ADS holders are financially better off if they reject the tender offer as inadequate, but individually, ADS holders are much worse off if other holders tender while they do not.

3.       To affect their scheme, on December 21, 2018, Frangou and the Board caused NMH to launch two grossly inadequate offers to exchange each series of ADS (the "Exchange Offers") for a likely prorated allocation of a small cash payment and an unsecured debt instrument with no meaningful protections.  Based on the economic terms alone, the Exchange Offers would fail.

4.       The related Consent Solicitations, however, state that whenever an investor tenders an ADS into the Exchange Offer, the act of tendering (*i.e.*, giving up the preferred securities in exchange for the offered payment) also constitutes a consent to amend the Certificates of

Designation that govern the ADS to eliminate substantially all the ADS's critical rights and protections. Indeed, the Amendment, if passed, will even eliminate ***the right of ADS holders to receive already accrued and unpaid dividends***. In other words, ADS holders have a powerful incentive to tender their ADS: if everyone acts individually and rationally in their own self-interest, it is better to receive at least some consideration (albeit grossly inadequate) rather than be the lone holdout and receive no payment whatsoever.

5.     The amount offered in the Exchange Offers is better than never receiving a dividend again. Yet it is nowhere near as attractive as the value the ADS would have if Frangou acted in good faith and allowed the Board to start paying off some of the accrued dividends. Thus, Frangou's prior disloyalty is being turned into a weapon, as the best bet for the Exchange Offers to succeed is if investors capitulate even if they believe the Company's fortunes are improving.

6.     Frangou and the Board's conduct in structuring this improper, coercive tender offer is not an honest mistake or innocent oversight. In September 2016, Navios launched a tender offer for ADS at $5.85 in cash and/or 4.77 shares of common stock for Series G per unit and $5.75 in cash and/or 4.69 shares of common stock for Series H per unit, without tying it to a consent solicitation. At that time, Frangou did not threaten ADS holders with the prospect of losing all their rights. The prior tender offer failed. This time, Frangou is attacking her ADS holders with the Consent Solicitations.

7.     Frangou and the Board have a powerful financial self-interest to abuse their positions at Navios at the expense of the ADS holders. If Frangou and the Board are successful in coercing enough ADS holders into tendering their ADS, Navios will be able to declare dividends to *common* stockholders, including Frangou (who holds almost 31% of the common stock) and

members of the Board (who hold various amounts of the common stock but zero ADS), while never paying the more than $28 million in accrued but unpaid dividends to the ADS.

8.      Frangou and the Board acted disloyally in creating the conditions leading to the Exchange Offers and are now continuing their disloyal scheme by exploiting the conditions they created as a hammer through which they will avoid a $28 million obligation.

9.      If Frangou and NMH are successful and preferred holders tender two-thirds of each series of the outstanding ADS shares to avoid being left in the unlucky remaining third that holds worthless paper, NMH will have implemented a tactic that could eviscerate the market for preferred shares, as it could easily be replicated by other unscrupulous companies. Since preferred stock investors typically seek income from dividends, the entire basis for preferred securities would unravel if companies could use coercive tender offers combined with consent solicitations as a weapon to eliminate the preferred rights and protections after starving those security holders of accruing dividends for extended periods of time.

10.     Plaintiff seeks damages to compensate all ADS holders who were improperly coerced into tendering their ADS and accepting the Consent Solicitation, and an Order invalidating the Consent Solicitation because it is procured through improper coercion.

## PARTIES

### A.      Plaintiff

11.     Plaintiff Norman Roberts ("Plaintiff") has been a holder of Series G ADS since November 26, 2014 and a holder of Series H ADS since December 10, 2014.  Plaintiff currently holds 2,000 Series G and 10,000 Series H ADS and is a resident of Florida.

### B.      Defendants

12.     Defendant Navios Maritime Holdings, Inc. ("NMH" or the "Company") is a world-wide maritime shipping and logistics company that focuses on the transport of dry bulk

commodities, including iron ore, coal, and grain.  NMH sits at the center of a web of interconnected shipping companies that each utilize the Navios brand.  NMH is incorporated under the laws of the Republic of the Marshall Islands and has its principal executive offices in Monte Carlo, Monaco.  NMH maintains an office at 825 3rd Avenue, New York, New York.  NMH common shares and ADS exclusively trade on the New York Stock Exchange ("NYSE").  NMH is named as a Defendant herein solely as a necessary party in its capacity as the entity through which the Director Defendants are breaching their duties and coercing ADS holders.

13.     Defendant Angeliki Frangou ("Frangou") has served as the Chair and CEO of NMH since August 2005.  In addition, she has served as the Chair and CEO of Navios Maritime Acquisition Corporation ("NMA") since March 2008, of Navios Maritime Partners L.P. ("Navios Partners"), a partnership controlled by NMH, since August 2007, and of Navios Maritime Midstream Partners L.P. ("Navios Midstream"), a partnership controlled by Acquisition, since October 2014.  Frangou has served as the Chair of Navios South American Logistics Inc. ("Navios South American"), which is majority owned by NMH, since its inception in December 2007. Before her involvement with NMH, Frangou served as the Chair, CEO and President of International Shipping Enterprises, Inc. ("International Shipping"), which acquired NMH in 2005. From 1990 through 2001, Frangou served as the CEO of Franser Shipping S.A. ("Franser Shipping").  Frangou controls and is the Chair of the investment firm IRF European Finance Investments Ltd. ("IRF") and previously served on the board of Marfin Investment Group.

14.     Frangou owns approximately 30.6% of the outstanding common stock of NMH and has stated her intention to acquire an additional $10 million worth of common stock, which would increase her ownership and her recovery if dividends are ever awarded to common stockholders. Frangou does not own any ADS, and cannot receive a single penny of dividends on her large

common stock position unless the ADS is first paid or is coerced into waiving their priority claims on NMH's cash.  Frangou's last known United States address is 150 W 56th St., Apt. 6501, New York, NY 10019.

15.     Defendant Spyridon Magoulas ("Magoulas") has served as a director of NMH since its inception.  Prior to that, he served as a director of International Shipping, under Frangou's control.  His employment and the perquisites of his directorship depend on Frangou's continued favor.  Magoulas's last known United States address is 2508 38th St., Astoria, NY 11103.

16.     Defendant George Malanga ("Malanga") has served as a director of NMH since April 2010.  Malanga has worked at Bank of New York Mellon ("BNYM") for twenty-nine years and currently serves as BNYM's Chief Credit Officer and is a member of its Operating Committee.  BNYM does business with NMH, including using BNYM as the Depositary of the Company's Series G and H preferred shares that are the subject of this Action.  As such, Malanga and BNYM have an interest in keeping Frangou happy.  Malanga's last known United States address is 28 Sentinel Dr., Basking Ridge, NJ 07920.

17.     Defendant John Stratakis ("Stratakis") has served as a director of NMH since its inception.  Prior to that, he served as a director of International Shipping, under Frangou's control.  His employment and the perquisites of his directorship depend on Frangou's continued favor.  Stratakis's last known United States address is 169 Sussex Dr., Manhasset, NY 11030.

18.     Defendant Shunji Sasada ("Sasada") has served as a director of NMH and as the President of Navios Corporation, Holding's wholly owned subsidiary, since January 2015.  Sasada has been an employee of NMH since May 1997, serving in additional capacities such as COO and Senior Vice President of Fleet Development of Navios Corporation.  Additionally, Sasada has served as director of Navios Partners since August 2007 and as a director of Navios Midstream

6

since October 2014.  His employment and the perquisites of his directorship depend on Frangou's continued favor.  Sasada's last known United States address is 46 Lockwood Rd., Riverside, CT 06878.

19.     The individuals listed in ¶¶ 13-18 above are collectively referred to herein as the "Director Defendants."

### C.     Relevant Non-Parties

20.     Efstathios Loizos ("Loizos") has served as a director of NMH since July 2010. Loizos also served as a director of Navios Partners from October 2007 to June 2010.

21.     Vasiliki Papaefthymiou ("Papaefthymiou") has served as Executive Vice President—Legal and as a director of NMH since its inception.  Prior to that, he served as a director of International Shipping.  Papaefthymiou also serves as Executive Vice President—Legal of Navios South American, Secretary of Navios Partners, Secretary of Acquisition, and Secretary of Navios Midstream.  Finally, Papaefthymiou served as the General Counsel of Franser Shipping from 1991 to 2001.

## JURISDICTION

22.     This Court has jurisdiction over this Action pursuant to 28 U.S.C. § 1332 in that diversity exists between Plaintiff and each of the Defendants and the amount in controversy exceeds $75,000, exclusive of interests and costs.

23.     This Court has personal jurisdiction over each Defendant because the Director Defendants caused NMH to initiate the Exchange Offers and Consent Solicitations, which seek to coercively and improperly acquire all of the outstanding ADS that are exclusively traded on the NYSE.  The harm imposed by these actions exclusively falls on a market located in New York and investors in that market.

24.     Moreover, BNYM, which is headquartered in New York, is the "Depositary" for the Company's Preferred Stock and is technically the only "holder" of the Preferred Stock, whereas public stockholders own the ADS.  BNYM also serves as the Exchange Agent for the Exchange Offers.  This means that ADS holders are being asked to tender their shares to BNYM in New York, and BNYM will be the entity that will deliver any shares of common stock or cash to the ADS holders who tender, also in New York.

25.     NMH maintains an office in New York.  According to its most recent annual report on Form 20-F, which was filed with the SEC on April 13, 2018, NMH leases 16,703 square feet of office space at 825 Third Avenue, New York, New York.  The Form 20-F also states that NMH has eleven employees at its New York Office and that "[NMH] sublets a portion [of the premises covered by the lease] to a third party pursuant to a sub-lease."

26.     Upon information and belief, Defendants Frangou, Magoulas, and Stratakis maintain residences in New York.

27.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the ADS that are the subject of Plaintiff's claims trade exclusively in this district and the Defendants directed their activities towards this district.  Thus, all of the harm imposed by these actions falls upon a market in this district.

## SUBSTANTIVE ALLEGATIONS

### A.     Background on NMH

28.     NMH is a global maritime shipping and logistics company that focuses on the transport of dry bulk commodities, including iron ore, coal, and grain.  Through a web of complicated stock ownership and corporate entities, NMH controls a myriad of other shipping corporations that operate under the "Navios" brand.

29.     NMH has two relevant outstanding series of preferred stock: 8.75% Series G Cumulative Redeemable Perpetual Preferred Stock ("Series G") and 8.625% Series H Cumulative Redeemable Perpetual Preferred Stock ("Series H" and, collectively with Series G, the "Preferred Stock").  The Preferred Stock trades on the NYSE in the form of American Depository Receipts ("ADS"), each of which represents a 1/100th interest in a preferred share.  Each ADS has a liquidation preference and book value of $25 per share.  Currently, there are 1,419,055 Series G ADS outstanding and 2,861,128 Series H ADS outstanding.

30.     Frangou owns 30.6% of the Company's common stock.  Importantly, neither Frangou nor the other Defendants own any ADS.  Therefore, they have a personal conflict in favoring the interests of common stockholders over those of ADS holders.

31.     The Series G Preferred Stock/ADS and the Series H Preferred Stock/ADS are each governed by "Certificates of Designation" that set forth their rights and protections.  As pertains to this Action, each Certificate of Designation contains the same rights and protections and they will be discussed jointly herein.

32.     Under the terms of the Certificates of Designation, dividends are cumulative and accrue quarterly.  If NMH fails to make a quarterly dividend payment to the holders of Preferred Stock, the pertinent dividend amount (8.75-9% of book value per annum for the Series G and 8.625-8.875% of book value per annum for the Series H) will still accrue.  Reflecting the Preferred Stock's superiority within the NMH capital structure, the Company must pay any accrued and unpaid Preferred Stock dividends before it can pay dividends on any common shares.  Moreover, unless cumulative preferred dividends have been paid in full, the Company may not redeem, repurchase, or otherwise acquire its common stock or ADS, except through an offer made to all ADS holders.

33.     The Certificates of Designation may not be amended in a manner that adversely affects the preferences, powers, or rights of the respective class of preferred stockholders without the affirmative vote or consent of the holders of at least two-thirds of the outstanding Series G or Series H ADS.  Moreover, any shares of Series G or Series H Preferred Stock/ADS that are held by the Corporation, any of its subsidiaries, or any of its affiliates are not entitled to vote on such matters.

34.     The Certificates of Designation provide that if preferred dividends are in arrears for six or more quarterly periods, as they have been, then the Preferred Stockholders have the right to collectively elect one member to the NMH Board or receive a 25-basis point increase in the applicable dividend rate.

35.     In short, Frangou and the Board raised millions of dollars to fund NMH's growth by providing significant and meaningful protections to ADS investors.  Those protections are supposed to create value for ADS holders in the normal course and ensure that the ADS are paid in any NMH restructuring before Frangou and the Board receive anything on their common shares.

**B.      Frangou and the Board Cut Off Dividends on the ADS and Try (But Fail) to Coerce Preferred Shareholders Into Waiving Their Rights**

36.     The International Dry Shipping market is cyclical.  Late 2015 to early 2016 marked a particularly bad trough in the market cycle.

37.     In 2015, the dry bulk industry had both a supply and demand problem, with too many operating ships and the first year-over-year decline in seaborne iron ore, coal, and grain since 1998.  As a result, NMH saw its adjusted EBITDA decline from $191.4 million in 2014 to $133.4 million in 2015, which resulted in NMH generating a mere $7 million of cash from operating and investing activities.

38.     This negative market trend continued into 2016.  For example, the Baltic Dry Index ("BDI"), which provides an assessment of the price of shipping major raw materials by sea, hit a 30-year low of 290 in February 2016.

39.     Despite the market swoon, market participants and investors alike perceived that the industry would see a positive turnaround.  In an October 15, 2015 analyst report, for example, J.P. Morgan Securities LLC ("JP Morgan") forecasted that dry bulk rates would decline in 2016, stabilize in 2017, and would not reach the mid-point of an upward turn in the cycle until the end of 2019 at the earliest.

40.     The decline in the dry bulk shipping market put significant near-term financial pressure on NMH.  In NMH's 2015 fourth quarter and full year earnings press release, dated February 23, 2016, Frangou acknowledged the difficult state of the shipping market and stated: "In light of the prolonged market weakness, we have adopted measures to reduce our cash requirements, without having to sell off assets and while honoring our obligations.  We have resourcefully established cash flow needed in the medium term to sustain the company until charter rates improve."

41.     One of the principle "measures to reduce [] cash requirements" that NMH announced was the suspension of the payment of dividends on the ADS.  Notably, since the international dry shipping market is cyclical by nature, no investors could have dreamed at the time that the suspension of dividends would continue for an extended period of time, much less for twelve quarters.

42.     In a February 23, 2016 presentation, NMH announced that it was suspending its dividends on both common and preferred stock in order to save $41 million annually.[1]  Frangou added that with the savings, NMH only had enough liquidity to last through 2017.  A few months later, on June 7, 2016, the Company received notice from the NYSE that it was not in compliance with the NYSE's continued listing standards because the average closing price of NMH's common stock over 30 consecutive trading days was less than $1.00 per share.

43.     The suspension of dividends on the ADS also had a marked effect on the trading price of each ADS series, which declined from above $20 each, as of mid-2015, to below $4 per unit by mid-2016.  Put simply, the payment of dividends is a core premise of ADS investments.

44.     As the BDI increased from its historic lows as 2016 progressed, the Company's performance began to stabilize and improve.  On September 19, 2016, the BDI reached 836 and, over the following week, it reached a high of 941 on September 23, 2016, thus indicating an improvement in the dry bulk shipping industry.

45.     On September 19, 2016, NMH also increased its liquidity by entering into a revolving loan facility with NMA (NMH's publicly traded subsidiary) that provided NMH the option to borrow as much as $70 million from NMA.  In a September 20, 2016 report, a Deutsche Bank analyst noted that NMH did not have a near-term liquidity issue and estimated the Company could be net cash flow breakeven in 2017.

46.     Not wanting to let a good crisis go to waste, Frangou and her Board tried to use the dividend suspension and the prospect of stripping ADS holders of their rights as a way to personally benefit.

---

[1] The Company had previously announced the suspension of dividends on common stock in November 2015.

47.     In the fourth quarter of 2016, when the Company had only missed three quarterly dividend payments on the ADS, NMH launched similar coupled Exchange Offers and Consent Solicitations that stipulated any tendering ADS holder would also provide a consent to eliminate substantially all of the critical rights and protections of their fellow ADS holders that did not tender.  The 2016 Exchange Offers initially offered Series G holders either $5.85 in cash or 4.77 shares of NMH common stock and Series H holders either $5.75 in cash or 4.69 shares of NMH common stock.  These amounts were below the fair value of the ADS, but were far greater than the amount of accrued but unpaid dividends to that point.

48.     Because NMH had only missed three quarterly dividend payments and the dry bulk shipping industry was already on an upswing, ADS holders were able to assume they would soon be made whole if they rejected the 2016 Exchange Offers and Consent Solicitations.  Moreover, in response to the filing of a lawsuit threatening to seek damages, Frangou reluctantly de-coupled the Exchange Offers from the Consent Solicitations.  As a result, holders tendered significantly less than two-thirds of each series of ADS.  When the Company canceled the Consent Solicitations and proceeded solely with non-coercive Exchange Offers, it even offered improved terms.  The final 2016 Exchange Offers offered Series G holders $7.18 in cash or 6.29 NMH shares and Series H holders $7.06 in cash or 6.19 NMH shares.  Ultimately, preferred holders (no longer facing the threat of being left with worthless ADS if they declined to take the cash tendered just 544,987 Series G ADS and 1,898,285 Series H ADS.

49.     Those ADS holders who declined to tender surely expected that they would soon receive the accrued dividends they were owed as well as future quarterly dividend payments.

**C.      Frangou and the Board Refuse to Pay Any of the Accrued Dividends as Market Conditions Improve, Showing ADS Investors That Frangou Would Starve Investors to Force Them Out**

50.      Over the following two years, the market and NMH's prospect significantly improved.  For example, NMH's Adjusted EBITDA increased from negative $62.8 million in 2016 to positive $68.8 million in 2017.  In just the first nine months of 2018, NMH's Adjusted EBITDA increased to $118.1 million.  According to JPMorgan, during the third quarter of 2018, NMH had its "best quarter in a while as [the] dry bulk business starts to shine."  NMH's increased earnings corresponds to an increase in the BDI, which generally traded above 1,000 during 2018 and peaked above 1,700.

51.      During this time, both the Series G and Series H ADS trading prices also significantly improved from their mid-2016 lows.  From January 2017 through September 2018, each series traded above $10 per ADS.  For most of 2017, each series traded above $15 per ADS.

52.      Even as conditions for the international dry bulk shipping industry improved in general, and NMH's performance improved in particular, Frangou and the Board still refused to pay any portion of the accrued but unpaid dividends to the Preferred ADS holders.

**D.      Frangou and the Board's Non-Coercive Tender Offers Fail**

53.      Instead of paying dividends, Frangou tried to buy out the ADS with two more non-coercive Exchange Offers.  Specifically, NMH offered Series G holders 8.25 shares of common stock (***worth $14.61***) per ADS and Series H holders 8.11 shares of common stock (***worth $14.36***) per ADS (together the "2017 Exchange Offers"). The 2017 Exchange Offers were not tied to a Consent Solicitation eviscerating the rights of non-tendering ADS holders.

54.      Despite the significant prices being offered without the threat of negative punishment to ADS holders who declined to tender, only 35,958 Series G ADS and 40,587 Series H ADS were tendered into those offers.  The vast majority of ADS did not tender into the 2017

Exchange Offers, thereby signaling that the Company's prospects were improving and could soon begin to pay dividends again.  However, despite having the ability to pay ADS holders a dividend, NMH refused to do so, eventually driving down the trading price of the ADS and setting the stage for the current round of coercive Exchange Offers and Consent Solicitations.

55.    After the Company missed six dividend payments on July 15, 2017, common stockholders refused to amend the Company's Articles of Incorporation to allow ADS holders to elect a director to the Company's Board.  As a result, and as per the Certificates of Designation, the quarterly dividend rate increased for each series of Preferred Stock by 0.25%.  This increased rate for ADS holders did not matter, as Frangou and the Board had no intention to honor the accrued dividend obligations on the ADS even if the Company could pay dividends.

**E.    In the Midst of a Criminal Investigation, Frangou Attempts to Squeeze Out NMH's ADS Holders**

56.    For the last several years, Frangou has been a target of a criminal investigation and is likely in need of immediate liquidity.  According to October 6, 2016 articles in *Splash 24/7* and *Cyprus Mail*, Frangou is among a group of sixteen individuals facing felony money-laundering charges involving Marfin Investment Group ("MIG") and Marfin Popular Bank.

57.    The charges relate to unsecured loans totaling €200 million that Marfin Popular Bank provided to IRF, an investment vehicle controlled and Chaired by Frangou.  Prosecutors charge that the loans appear to have been granted to allow IRF to purchase shares in MIG and Marfin Popular Bank in order to artificially inflate their capital.  Those loans have now passed to and been restructured by Piraeus Bank S.A. ("Piraeus Bank").

58.    On March 29, 2018, Frangou pledged 14,511,171 of the 39,665,352 NMH common shares she owned as security under a Facilities Agreement with Piraeus Bank.  As a result, although she technically still owns those shares, she cannot freely monetize them and the bank may have

the contractual ability to influence or constrain even more of her shares.  Thus, Frangou's immediate need for liquidity may be acute.

59.     On November 7, 2018, *Seatrade Maritime News* reported that as a result of the ongoing investigation into these loans, Greek judicial authorities froze bank accounts owned by Frangou and Marfin Popular Bank.

60.     Therefore, Frangou is likely in need of liquidity with limited options.  Because she owns over 30% of the Company's outstanding common shares but none of the ADS, she is more incentivized than ever to strip value from preferred holders in favor of common holders.

61.     Given the recent upswing in the Company's prospects, Frangou and the rest of the NMH Board apparently saw an opportunity to squeeze out the holders of the Company's ADS in order to eliminate the accumulation of accrued dividends that must be paid to them before dividends can again be paid to common stockholders.

**F.     NMH Launches a Coercive Exchange Offer and Consent Solicitation**

62.     On December 21, 2018, NMH filed forms with the SEC to launch the Exchange Offers and Consent Solicitations for each of the Series G and Series H ADS that are currently scheduled to expire at 5 PM on February 1, 2019.  By tying the tender offer to the Consent Solicitation, Frangou and the Board are forcing ADS holders to make a decision that has nothing to do with the economic value of the offer – tender and thereby accept less than the unpaid dividends or risk losing all protections going forward, including the right to receive all accrued but unpaid dividends.

63.     In the Exchange Offers, NMH is offering to acquire each Series G ADS for either $4.83 in cash or $5.52 in principal amount of newly issued 9.75% Senior Notes due 2024 and each Series H ADS for either $4.77 in cash or $5.46 in principal amount of newly issued 9.75% Senior Notes due 2024.  Unpaid accrued dividends currently total approximately ***$6.66 per Series G ADS***

16

and *$6.56 per Series H ADS*, significantly more than the cash value of the consideration offered in the Exchanges Offers.

64.     NMH has tied the Exchange Offer to a Consent Solicitation.  By tendering into the Offer, the ADS holder is also deemed to have provided Consent to amend the Certificates of Designation to "***eliminate substantially all of the restrictive covenants and our obligation to pay or accrue any unpaid dividends from any past periods or future periods and to amend certain voting rights.***"  ADS holders are told they can accept a drastic discount now relative to accrued dividends and at least finally receive ***some*** payment of unpaid dividends or risk losing critical rights and protections – including the right to receive ***any*** unpaid dividends – going forward. Indeed, the Consent Solicitation seeks to (i) eliminate the requirement that it pay preferred stockholders accrued dividends, including both the dividends that have already accrued since the suspension of dividend payments in February 2016 and future quarterly dividends that are not paid;[2] (ii) eliminate the increased dividend rate that results if ADS holders are not permitted to elect a director after six or more missed dividend payments; (iii) eliminate the prohibition on repurchasing or redeeming common or preferred shares unless all accrued dividends have been paid to preferred stockholders; and (iv) lower the voting threshold of ADS holders from two-thirds to a simple majority in order to consent to certain future actions that have a negative effect on ADS holders.

65.     By tying the Exchange Offer to the Consent Solicitation, Frangou and the Board are seeking to personally benefit from their own refusal to pay on accrued dividends or to declare dividends for twelve quarters and counting.  They have withheld payment and now seek to coerce

---

[2] Eliminating the accrual of dividends also lowers the liquidation preference of the ADS from the $25 principal amount plus accrued dividends to just the $25 principal amount.

ADS holders into accepting a fraction of what they are owed, leaving the remainder for Frangou, the Board and others common stockholders.   This self-interested conduct is patently disloyal.

66.     In SEC filings setting forth the Exchange Offers and Consent Solicitations, NMH also threatened ADS holders that if a sufficient number of ADS are tendered: (1) the remaining ADS may be delisted from the NYSE, thus further hampering their liquidity and value; and (2) the IRS may treat the amendment of the Certificates of Designation as a distribution subject to federal taxes.

67.     Meanwhile, Frangou and the Board maintain their threat that ADS holders will receive no dividend payment whatsoever if the Exchange Offer fails.  The prospectus for the Exchange Offers and Consent Solicitations informs ADS holders that the Company "currently [has] no plans or intents to pay dividends[.]"  Accordingly, investors who have given up on the prospect of good faith and loyal treatment by Frangou and the Board can rationally prefer to take *some* consideration in the Exchange Offers – especially given the threats of the Consent Solicitation and the Prospectus – rather than watch their investments dwindle to zero.

68.     Each Exchange Offer is subject to a waivable condition that Series G and Series H ADS holders tender two-thirds of the respective outstanding ADS of each series.  In other words, in light of the Consent Solicitations, Frangou is not committing to buy ***any*** ADS unless she gets the benefit of eliminating all protections currently available to all ADS holders who choose not to tender.

69.     ADS Holders who tender as a result of the improper coercion face constraints on the form of consideration they will receive.  First, there is a proration mechanism that ensures no more than 50% of the total number of Series G ADS that are tendered and accepted for exchange and no more than 50% of the Series H ADS that are tendered and accepted for exchange are

exchanged for the cash consideration. Thus, at least half of the tendered ADS must be exchanged for Senior Notes. But the Senior Notes are effectively worthless consideration. They will not contain restrictive covenants, including covenants preventing the incurrence of additional more senior debt, and only provide for limited events of default. They will not be guaranteed or secured by any assets and they will not be rated by any credit rating agency. They will not be listed on any securities exchange and will thus surely be illiquid.

70.     Another way in which Frangou and the Board are breaching their duties to preferred ADS holders is by capping the number of ADS units they will accept. Specifically, NMH will *only* accept two-thirds of the outstanding ADS of each series for exchange. Therefore, if the Exchange Offers are successful, one-third of each series of ADS will remain outstanding under any circumstance – while stripped from their basic right to receive any accrued but unpaid dividends and become effectively worthless – even if all ADS holders are coerced into tendering. If more than two-thirds of the ADS are tendered, the Company will accept those shares on a prorated basis so that even tendering ADS holders will be forced to retain a portion of their soon to be worthless ADS. In effect, the more holders that tender, the less NMH will pay to each holder in the Exchange Offers.

71.     A simple example illustrates the manipulative structure of the Exchange Offers. Suppose a stock was publicly trading for $10 per share. A controlling stockholder looking to eliminate the stock offers to pay $8 per share in cash, but only for up to 50% of the shares, with the remainder receiving a worthless debt security. However, if a shareholder does not tender while others do, they face the possibility of receiving nothing rather than $8 or some prorated fraction of $8. Therefore, if shareholders believe that sufficient shares will tender to cause the offer to be accepted, then they each have an incentive to tender and receive something rather than nothing,

19

which may then cause enough shares to be tendered to cause the offer to be accepted. In this example, if 100% of the stockholders tender their stock trading at $10 per share, each will receive only receive $4 in cash (50% of the $8 in cash that is offered), plus the worthless debt security.

72. The Exchange Offers provide inadequate consideration for each of the Series G and) Series H ADS and would surely fail absent Defendants' improper coercion, including the tied Consent Solicitation.[3] They do not even offer ADS holders as much value as the accrued dividends they would be forced to give up. Tellingly, NMH did not obtain an opinion from an investment bank or any third party opining on the fairness of the proposed consideration to the ADS holders.

### G. The Exchange Offers and the Consent Solicitations Are Coercive

73. If the Exchange Offers only offered a financial inducement to tender, Plaintiff would not have brought this lawsuit. Each ADS holder could make his or her own decision, based on the merits of the deal, about whether to accept the consideration offered by NMH in the Exchange Offer and that decision would have no effect on those who choose not to tender.

74. However, NMH tied the Exchange Offers to the Consent Solicitations, thereby forcing ADS holders to make a decision with respect to the tender offer that has nothing to do with the economic value of that offer. NMH also threatens that remaining ADS may be delisted from the NYSE and that remaining ADS holders may have to pay a tax despite the fact that they are retaining property that will have lost any remaining value. As a result, ADS holders are pressured

---

[3] The terms of the current Certificate of Designations provide Holdings the option to redeem all of the Series G ADS and Series H ADS without the consent of the holders at any time after January 2, 2019 and July 8, 2019 respectively. However, in order to do so, Holdings would have to pay the holders their full liquidation preference of $25 per ADS plus accrued dividends, something Frangou and the other Defendants clearly want to avoid.

to tender their ADS, regardless of their views on the economic merits of the offered consideration to avoid being left as holders of ADS that have been stripped of their protections and value.

75.     This is no different from the coercive "two-tiered tender offers" that Delaware courts have determined create the right and "obligation" on corporate directors to "defend the corporate bastion" from such threats.  *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 94, 953-54 (Del. 1985).  Applied in this context, if there were any NMH directors who were not personally conflicted themselves, they would have an affirmative obligation to take defensive action to prevent and block the two-tiered coercive offer Frangou is pressing.  Unfortunately, there are no independent and non-conflicted NMH directors.

76.     Given the improper coercion of ADS holders, it is only natural that NMH's Board no interest in learning the views of ADS holders who do not tender about the proposed changes to the Certificates of Designation.  Indeed, the Company's Amended No. 1 to Form F-4 filed on January 11, 2019, makes clear that NMH is only seeking the consent from those ADS holders who are also tendering—it is "not soliciting and will not accept consents from holders who are not tendering their [ADS] pursuant to [the Exchange Offers.]"  Those who decide not to tender literally have no say on the elimination of their rights.

77.     These actions are designed to benefit Frangou and her controlled Board members (who only hold the otherwise nearly worthless common stock) at the expense of the ADS holders.  Frangou owns 30.6% of the outstanding common stock and faces a personal liquidity crisis.  The other directors hold only NMH common stock and, perhaps as importantly, other positions across the Navios empire at the behest of Frangou.

78.     As explained above, the prospects for the Company and the industry appear to be improving.  However, under the current terms of the Certificates of Designation, the ADS holders

would be able to enjoy the proceeds of this recovery long before anything is paid to the common stockholders, as the Company would be required to pay them all accrued dividends before returning capital to common stockholders, whether through dividends or stock repurchases.  If the Exchange Offers and Consent Solicitations are successful, the common stockholders, including Frangou, will all but move ahead of the ADS holders in the capital structure and retain all of the benefits of the recovery.

## FIDUCIARY DUTIES OF THE DIRECTOR DEFENDANTS

79.     Pursuant to the Marshall Islands Business Corporations Act, the Republic of the Marshall Islands has adopted Delaware corporation law (and the law of other U.S. states with substantially similar provisions), both with respect to statutory provisions and with respect to non-statutory law, insofar as the non-statutory law of Delaware and the U.S. does not conflict with other provisions of the Business Corporations Act.  52 MIRC § 13; *see also Metcalf v. Zoullas*, No. 11 Civ. 3996 (AKH), 2012 WL 169874, at *3 (S.D.N.Y. Jan. 19, 2012) ("Marshall Islands law… look[s] to Delaware corporate law.").

80.     Like the common law of fiduciary duties under Delaware and New York law, the Marshall Islands Business Corporations Act expressly provides a standard of care that all corporate directors must meet.  Specifically, the Business Corporations Act notes that "[d]irectors and officers shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions."  52 MIRC § 61.

81.     By reason of their positions as officers, directors, and/or fiduciaries of NMH and because of their ability to control the business and corporate affairs of NMH, the Director Defendants owe fiduciary duties to NMH and the ADS holders, including the duties of care, loyalty, and good faith, and were required to use their utmost ability to control and manage NMH

in a fair, just, honest, and equitable manner.  Each director of the Company owes to NMH and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and the highest obligations of fair dealing.

## CLASS ALLEGATIONS

82.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other holders of Series G and Series H ADS that are being, have been, or will be harmed by the conduct described herein (the "Class").  Excluded from the Class are Defendants, and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant, and their successors in interest.

83.     This action is properly maintainable as a class action.

84.     The Class is so numerous that joinder of all members is impracticable.  As of December 19, 2018, there were 1,419,055 Series G ADS and 2,861,128 Series H ADS outstanding, held by hundreds, if not thousands, of individuals and entities across the country.

85.     Questions of law and fact are common to the Class, including, among others:

    i.   Whether the Exchange Offers and Consent Solicitations are Coercive;

    ii.  Whether Plaintiff and the other members of the Class have been or will be harmed by such misconduct; and

    iii. Whether Plaintiff and the other members of the Class are entitled to injunctive relief or damages as a result of such misconduct.

86.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of other members of the Class and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

87.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to such adjudications or would substantially impair or impede their ability to protect their interest.

88.     The Defendants have acted or refused to act on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

89.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   The expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.  Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action.

## COUNT I

**Breach of Fiduciary Duty Against the Director Defendants For Disloyalty In Connection With the Exchange Offers and Consent Solicitations**

90.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

91.     The Director Defendants, as directors of NMH, owe and owed the Company and its stockholders, including the holders of Series G and Series H ADS, the highest duties of care, loyalty, good faith, and candor.  Moreover, as directors of NMH, they have the ability to, and did in fact, exercise control over the wrongful acts of NMH as described herein.

92.     As explained above, the Exchange Offers and Consent Solicitations improperly coerce ADS holders to tender into the Exchange Offer.  By causing the Company to undertake the

24

coercive Exchange Offers and Consent Solicitation, the Director Defendants have breached their fiduciary duties to the ADS Holders.

93.     As a result, the Plaintiff and the other members of the Class have been or will be harmed.

## COUNT II

**Breach of Fiduciary Duty Against the Director Defendants For Disloyalty In Connection With the Self-Interested Refusal to Pay Dividends**

94.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

95.     The Director Defendants, as directors of NMH, owe and owed the Company and its stockholders, including the holders of Series G and Series H ADS, the highest duties of care, loyalty, good faith, and candor.  Moreover, as directors of NMH, they have the ability to, and did in fact, exercise control over the wrongful acts of NMH as described herein, including NMH's failure to pay dividends to ADS holders for twelve consecutive quarters.

96.     As explained above, the Director Defendants starved ADS holders of dividends they were entitled to, thus driving down the value of both the Series G and Series H ADS.  Then, once the value of the ADS were sufficiently depressed, they caused NMH to launch the coercive Exchange Offers and Consent Solicitations.  By causing NMH to engage in this scheme, the Director Defendants have breached their fiduciary duties.

97.     As a result, the Plaintiff and the other members of the Class have been or will be harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

   a.   Declaring that this action is properly maintainable as a Class Action;

b.   Declaring that the Director Defendants breached their fiduciary duties to the Class;

c.   Declaring that the Consent Solicitation is invalid;

d.   Awarding damages to Plaintiff and the Class;

e.   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action,
including but not limited to attorneys' fees; and

f.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demand a trial by jury.

DATED: January 23, 2019

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

/s/ *Mark Lebovitch*
Mark Lebovitch
Jeroen van Kwawegen
Christoper J. Orrico
Tamara Gavrilova
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
MarkL@blbglaw.com
Jeroen@blbglaw.com
Christoper.Orrico@blbglaw.com
Tamara.Gavrilova@blbglaw.com

*Attorneys for Plaintiff Norman Roberts and
the Class*