UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NORMAN ROBERTS, on behalf of himself and all those
similarly situated,

                              Plaintiff,

            - against -

NAVIOS MARITIME HOLDINGS, INC., ANGELIKI N.
FRANGOU, SPYRIDON MAGOULAS, GEORGE
MALANGA, JOHN STRATAKIS, AND SHUNJI
SASADA

                              Defendants.

1:19-cv-00655 (JSR)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP
Israel David
Justin J. Santolli

One New York Plaza
New York, New York 10004
(212) 859-8000
israel.david@friedfrank.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................. 3

    A.    The Company and Its Preferred Stock ........................................................ 3

    B.    Background to the First Roberts Action ..................................................... 6

    C.    Background to the Current Roberts Action ................................................ 9

ARGUMENT ....................................................................................................................... 12

   I.     PLAINTIFF'S CLAIMS FOR BREACH OF FIDUCIARY DUTY
        SHOULD BE DISMISSED BECAUSE PLAINTIFF, A PREFERRED
        STOCKHOLDER, MERELY INVOKES HIS CONTRACTUAL RIGHTS
        ....................................................................................................................... 12

    A.    Plaintiff Cannot State a Claim for Breach of Fiduciary Duty Based
        on the Current Exchange Offer and Consent Solicitation ......................... 14

    B.    Plaintiff Cannot State a Claim for Breach of Fiduciary Duty Based
        on the Failure to Pay Dividends on the Preferred Stock ........................... 14

   II.    EVEN ASSUMING ARGUENDO THAT FIDUCIARY DUTIES ARE
       IMPLICATED, NEITHER THE CURRENT OFFER NOR THE
       BOARD'S FAILURE TO PAY DIVIDENDS IS IMPROPERLY
       COERCIVE .................................................................................................. 16

    A.    The Current Offer's Transaction-Based Incentives and the Board
        of Directors' Suspension of Dividends Do Not Constitute
        Inequitable Coercion ................................................................................. 16

    B.    The Current Offer Represents a Real Economic Choice ......................... 21

    C.    Coupling the Current Exchange Offer with the Current Consent
        Solicitation is Not Coercive ...................................................................... 23

   III.   PLAINTIFF'S CLAIMS BASED ON ALLEGED COERCION AS TO
       THE SERIES H PREFERRED SHARES SHOULD BE DISMISSED AS
       MOOT .......................................................................................................... 24

CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................12, 16

*Cantor Fitzgerald, L.P. v. Cantor,*
    No. 18101, 2001 WL 1456494 (Del. Ch. Nov. 5, 2001) ...........................17, 22, 23

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002)................................................................12

*Eisenberg v. Chicago Milwaukee Corp.,*
    537 A.2d 1051 (Del. Ch. 1987)..................................17, 18, 19, 20, 21

*F5 Capital v. Pappas,*
    14 Civ. 9356, 2016 WL 900389 (S.D.N.Y. Feb. 17, 2016)................................12

*Frederick Hsu Living Trust v. ODN Holding Corp.,*
    No. 12108-VCL, 2017 Del. Ch. LEXIS 67 (Del. Ch. Apr. 14, 2017) ....................13

*In re General Motors Class H S'holders Litig.,*
    734 A.2d 611 (Del. Ch. 1999)..................................17, 18, 21, 24

*Gradient OC Master, LTD v. NBC Universal, Inc.,*
    930 A.2d 104 (Del. Ch. 2007)................................................21, 22, 23

*H-M Wexford LLC v. Encorp, Inc.,*
    832 A.2d 129 (Del. Ch. 2003)................................................................22

*HB Korenvaes Investments, L.P. v. Marriott Corp.,*
    No. 12922, 1993 WL 257422 (Del. Ch. July 1, 1993)................................15, 17, 19

*HB Korenvaes Invs., L.P. v. Marriott Corp.,*
    No. 12922, 1993 WL 205040 (Del. Ch. June 9, 1993) ........................................14

*Ivanhoe Partners v. Newmont Mining Corp.,*
    533 A.2d 585, 605 Del. Ch. 1987 ................................................................16, 17

*Jedwab v. MGM Grand Hotels, Inc.,*
    509 A.2d 584 (Del. Ch. 1986)................................................................13

*Katz v. Oak Indus., Inc.,*
    508 A.2d 873 (Del. Ch. 1986)................................................................24

*Kramer v. Time Warner, Inc.*,
    937 F.2d 767 (2d Cir. 1991)................................................................................12

*Lacos Land Co. v. Arden Group, Inc.*,
    517 A.2d 271 (Del. Ch. 1986)..........................................................................18

*In re Marriott Hotel Props. II Ltd. P'ship Unitholders Litig.*,
    No. 14961, 2000 WL 128875 (Del. Ch. Jan. 24, 2000) ...................................24

*MCG Capital Corp. v. Maginn*,
    No. 4521-CC, 2010 WL 1782271 (Del. Ch. May 5, 2010) ...............................14

*Roberts v. Navios Mar. Holdings, Inc.*,
    No. 16 CIV. 7860, 2017 WL 4286321 (S.D.N.Y. Sept. 26, 2017).............2, 7, 8, 9, 21, 22, 23

*In re Trados Inc. S'holder Litig.*,
    73 A.3d 17 (Del. Ch. 2013)...............................................................................13

*Weiss v. Samsonite Corp.*,
    741 A.2d 366 (Del. Ch. 1999).....................................................................17, 19

**Statutes**

Federal Rule of Civil Procedure 8 ...................................................................................8

Federal Rule of Civil Procedure 12(b)(6) ...............................................................1, 2, 8, 12

Marshall Islands' Business Corporation Act § 13 ........................................................13

Defendants Navios Maritime Holdings Inc. ("Navios" or the "Company") and Angeliki N. Frangou, George Malanga, John Stratakis, and Shunji Sasada (the "Director Defendants" and with Navios, collectively, the "Defendants")[1] respectfully submit this memorandum of law in support of Defendants' Motion to Dismiss the Complaint.

## PRELIMINARY STATEMENT

This action replicates a 2016 class action lawsuit brought by the *same* plaintiff, Norman Roberts, represented by the *same* law firm, asserting the *same* core claims, in this *same* District, arising out of a transaction that is the *same* in all material respects to the exchange offer and consent solicitation challenged in this lawsuit. Judge Katherine Failla ruled that the 2016 lawsuit (the "First Roberts Action") would not have survived a Rule 12(b)(6) motion to dismiss. The same result should inure here.

The First Roberts Action arose out of Navios' September 2016 exchange offer ("2016 Exchange Offer") for its Series G and Series H preferred shares, in which holders were offered the opportunity to tender their shares at a material premium to the then-prevailing market price in exchange for a combination of Navios common stock and cash. The 2016 Exchange Offer was accompanied by a consent solicitation ("2016 Consent Solicitation," collectively with the 2016 Exchange Offer, the "2016 Offer") through which Navios sought to amend the certificates of designation governing the Series G and H Preferred Shares. The 2016 Exchange Offer was conditioned on 66 2/3% of the holders tendering their shares, which was also the percentage required to effectuate the proposed amendments under the 2016 Consent Solicitation. In the First Roberts Action, Plaintiff alleged that the 2016 Exchange Offer and 2016 Consent Solicitation were impermissibly coercive. Faced with the same arguments as those raised by Defendants in this

---

[1]     Although named as a defendant, Spyridon Magoulas was not served with process.

motion (given the duplicative nature of the two actions), the Court held that Plaintiff's complaint would not survive a Rule 12(b)(6) motion to dismiss. *Roberts v. Navios Mar. Holdings, Inc.,* No. 16 CIV. 7860, 2017 WL 4286321, at *5-8 (S.D.N.Y. Sept. 26, 2017) (the "2016 Decision and Order").

On December 21, 2018, Navios commenced another exchange offer ("Current Exchange Offer") and consent solicitation ("Current Consent Solicitation", collectively with the Current Exchange Offer, the "Current Offer") that is substantially similar to the 2016 Offer. Again, Navios offers holders of the Series G and Series H preferred shares the opportunity to tender their shares at a material premium to the prevailing market price — that premium currently sits at 125% to 155% depending on the mix of cash and notes selected by holders in the tender — in exchange for a combination of Navios cash and, in this case, debt. Through the Current Consent Solicitation, Navios once more seeks to amend the governing certificates of designation.

Undeterred by his prior failure, Plaintiff filed the instant case bringing claims based on the same legal theories advanced in the First Roberts Action and previously rejected by Judge Failla. First, Plaintiff's claims for breach of fiduciary duty, based both on the Current Offer and on the failure to pay dividends, fail as a matter of law. Under applicable Delaware law, directors owe no fiduciary duties to preferred stockholders unless they invoke rights shared equally with common stockholders. Here, the rights of preferred stockholders at issue are rooted in the contracts that govern the preferred shares. The Director Defendants cannot breach a duty they do not owe.

Second, even assuming that fiduciary duties are implicated here (they are demonstrably not), neither the Current Offer nor the Board of Directors' decision not to pay dividends is actionably coercive. Actionable coercion under Delaware law requires use of an extrinsic factor unrelated to the substantive merits of the deal in an attempt to influence shareholders' decisions.

This influence is absent here. A deal that is merely "too good to resist" is not actionably coercive. Likewise, pursuant to the certificates of designation governing the preferred shares at issue, Navios has the sole and absolute discretion to determine whether to pay (much less suspend) any dividends. The 2018 Offer provides shareholders with a real economic choice. Plaintiff's tortured reading of Navios' SEC filings fail to articulate any threat of retribution by Defendants. Just as the District Court in the First Roberts Action found no coercion in the linkage of the 2016 Exchange Offer and 2016 Consent Solicitation, linkage of the Current Exchange Offer and Consent Solicitation is not coercive here. The use of exit consents is an established and legitimate exercise of contractual rights, permissible under Delaware law.

*       *       *

In the ensuing period since the Complaint was filed, the Current Consent Solicitation in respect of the Series H preferred shares failed and was withdrawn on March 4, 2019, when only 37% of the holders had tendered their shares notwithstanding a substantial increase in the consideration offered by Navios, as detailed below. As a result, Plaintiff's claims in respect of the Series H preferred shares are moot. The lawsuit now centers around the question of whether the Defendants breached any fiduciary duties in respect of the Series G preferred shares. As detailed herein, they did not.

Plaintiff's Complaint should be dismissed with prejudice.

<h2 style="text-align:center"><u>FACTUAL BACKGROUND</u></h2>

**A. The Company and Its Preferred Stock**

*Navios.* Navios is a global seaborne shipping and logistics company focused on the transport of dry bulk commodities, including iron ore, coal and grain. Ex. A, Complaint

("Compl.") ¶ 12, ECF No. 1.[2]  Navios is headquartered and has its principal executive offices in Monte Carlo, Monaco and is incorporated under the laws of the Republic of the Marshall Islands. *Id*.

**Navios' Stock**.  Navios has issued common stock and two classes of preferred stock that trade exclusively on the New York Stock Exchange ("NYSE").  *Id*. ¶¶ 29, 42.  Both classes of preferred stock — 8.75% Series G Cumulative Redeemable Perpetual Preferred Stock ("Series G ADSs") and 8.625% Series H Cumulative Redeemable Perpetual Preferred Stock ("Series H ADSs" and, collectively with Series G ADSs, the "Preferred Shares") — trade on the NYSE as American Depositary Receipts ("ADS") representing 1/100th interest in a preferred share.  *Id*. ¶ 29.  The Preferred Shares have a liquidation preference of $25 per share.  *Id*.  There are currently 1,419,055 Series G ADSs and 2,861,128 Series H ADSs outstanding.  *Id.*

The Preferred Shares are governed by their respective Certificates of Designation, under which cumulative dividends accrue on a quarterly basis.  *Id.* ¶ 32.  Navios is under no obligation to pay any dividends to the ADS holders and may exercise its discretion not to do so.  Ex. D, Series G COD, Section 3(a) ("Series G Holders shall be entitled to receive Series G Dividends *from time to time* out of any assets of the Corporation legally available for the payment of dividends at the Series G Dividend Rate per share of Series G Preferred Stock, *when, as, and if declared by the Board of Directors*.") (emphasis added); Ex. E, Series H COD, Section 3(a) (same).  If Navios fails to pay dividends for six quarters, the Preferred Shares may elect a director to the Board, provided that Navios' Articles of Incorporation have been amended to permit the Preferred Shares to exercise certain voting rights, or, as is relevant here, receive a twenty-five basis point increase

---

[2]     All references to "Ex." are exhibits attached to the Declaration of Justin J. Santolli, dated March 6, 2019 and filed herewith.

in the dividend rate.  Ex. A, Compl. ¶¶ 31, 34, 55; Ex. D, Series G COD, Section 5(b); Ex. E, Series H COD, Section 5(b).

Amendments to the respective certificates of designation are explicitly permitted by their terms — even amendments that "materially and adversely alter[] the preferences, powers or rights" of the Preferred Shares — provided that at least 66 2/3% of the Preferred Shares consent.  Ex. D, Series G COD, Section 5(c)(i) ("Unless the Corporation shall have received the affirmative vote or consent of the holders of at least 66 2/3% of the outstanding Series G Preferred Stock, voting as a single class, the Corporation shall not adopt any amendment to the Articles of Incorporation that materially and adversely alters the preferences, powers or rights of the Series G Preferred Stock."); *id*. at Section 8 ("'Articles of Incorporation' means the Amended and Restated Articles of Incorporation of the Corporation, as they may be amended from time to time in a manner consistent with this Certificate of Designation, *and shall include this Certificate of Designation*.") (emphasis added); Ex. E, Series H COD, Sections 5(c)(i) and 8 (same).

***Navios' Financial Troubles*.**  From 2015 through early-2016, the global dry bulk shipping market suffered declines in shipping rates and demand.  Ex. A, Compl. ¶¶ 36-37.  Between 2014 and 2015, in a mere one-year span, Navios suffered a $58 million decline in EBITDA and generated only $7 million in cash from operating and investing activities.  *Id*. ¶ 37.  Accordingly, Navios took steps "to reduce [the Company's] cash requirements, without having to sell off assets and while honoring [its] obligations."  *Id*. ¶ 40.  On February 23, 2016, Navios announced that it was suspending the payment of dividends to both common and preferred stockholders.  *Id*. ¶ 42.  Illustrative of Navios' financial trouble, at the time it initiated the 2016 Offer (in September 2016), Navios had a market capitalization of approximately $121 million, as compared to a market

capitalization of approximately $27.5 million at the time of the December 21, 2018 commencement of the Current Offer, a staggering decline of $93.5 million, or *77%*.

**B.** **Background to the First Roberts Action**

*2016 Offer.*   On September 19, 2016, Navios initiated the 2016 Exchange Offer to exchange cash and/or newly issued shares of Navios common stock for any and all outstanding shares of either its Series G ADSs or Series H ADSs.  Ex. O, 09/19/16 Schedule TO.  ADS holders were entitled to tender any portion of their shares for cash and any portion for common stock, provided that no more than 50% of each of the Series G ADSs and Series H ADSs tendered would receive cash (*i.e.*, any shares tendered in excess of that amount would be allocated shares of common stock).  *Id.*

Navios also sought via the 2016 Consent Solicitation consent to amend and restate the certificates of designation under which the Series G ADSs and Series H ADSs were issued to eliminate substantially all of the voting rights and restrictive covenants in the existing certificates of designation, and the act of tendering by an ADS holder constituted the ADS holder's consent to such amendments.  Ex. A, Compl. ¶ 47; Ex. O, 09/19/16 Schedule TO at pp. 2-3.  One such proposed amendment would have stripped ADS holders of the right to "payment of accrued dividends on the Preferred Shares, whether in the future or in arrears."  Ex. O, 09/19/16 Schedule TO at p. 18.  Because the certificates of designation require the consent of at least 66 2/3% of the outstanding shares of each series to amend the respective certificates of designation, the 2016 Exchange Offer was conditioned upon, among other things, the tender of at least 66 2/3% of the Series G ADSs and/or Series H ADSs (the "Minimum Tender Condition").  *Id*. at p. 4.

*Commencement of the First Roberts Action*.  On October 7, 2016, Plaintiff filed a class action lawsuit in this District, alleging that the 2016 Exchange Offer was actionably coercive in

light of the accompanying 2016 Consent Solicitation.  *See Roberts v. Navios Mar. Holdings, Inc.,*
No. 16 CIV. 7860, 2017 WL 4286321 (S.D.N.Y. Sept. 26, 2017).

      ***Failure to Achieve Minimum Tender Condition.***  On October 18, 2016, Navios announced
that the ADS holders tendered only 18.5% of the Series G ADSs and 34.5% of the Series H ADSs.
*Roberts*, 2017 WL 4286321, at *4.  Navios extended the 2016 Exchange Offer until October 31,
2016 and increased the offered consideration, but again failed to meet the Minimum Tender
Condition.  *Id.*  In response, Navios again extended the 2016 Exchange Offer (one last time until
November 7, 2016), terminated the 2016 Consent Solicitation, and waived the Minimum Tender
Condition.  *Id.*  On November 8, 2016, Navios accepted for exchange all Preferred Shares validly
tendered and not withdrawn.  *Id.*

      ***Dismissal of the First Roberts Action.***  On November 28, 2016, Plaintiff's counsel filed a
letter with the Court stating that "as a result of [Navios's] decision to terminate the Consent
Solicitation, Plaintiff's claims … are moot" and indicating that Plaintiff would seek attorneys'
fees.  *Id.* at *4.  On January 10, 2017, Plaintiff filed a motion for an award of attorneys' fees.  *Id.*
at *1, *4.  Plaintiff argued that under Delaware's corporation benefit doctrine, he was entitled to
such fees because his filing of the First Roberts Action "benefited his fellow shareholders by
threatening the Navios Board with personal liability for an alleged coercive tender offer and by
providing an apparatus for shareholders to resist the tender offer."  *Id.* at *1.  In opposition, the
Navios defendants asserted that Plaintiff was not entitled to attorneys' fees because, among other
things, Plaintiff's complaint was not meritorious when filed, and detailed the reasons why a Rule
12(b)(6) motion to dismiss would have been granted had the Navios defendants had an opportunity
to make such a motion prior to the lawsuit becoming moot.

***Judge Failla Rejects Plaintiff's Contentions***.  On September 26, 2017, Judge Failla issued a twenty-seven page opinion that denied Plaintiff's motion for attorneys' fees and dismissed the First Roberts Action as moot.  *Roberts*, 2017 WL 4286321, at *1.  In considering whether to award attorney's fees pursuant to Delaware's corporation benefit doctrine, the Court considered whether "'the suit was meritorious when filed.'"  *Id*. at *4 (citations omitted).  To do so, "under Delaware law, . . . 'the standard the Court [looked] to *is whether the claim would have been able to withstand a motion to dismiss*.'"  *Id*. (emphasis added).  Because the Court sat in diversity, the Court assessed the adequacy of the complaint under Federal Rules of Civil Procedure 8 and 12(b)(6).  *Id*. at *5.

Judge Failla ruled that the First Roberts Action was not meritorious when filed, and that coupling the 2016 Exchange Offer with the 2016 Consent Solicitation was not actionably coercive. *Id*. at *7-8.  The Court rejected Plaintiff's contention that linkage of the 2016 Exchange Offer and 2016 Consent Solicitation forced preferred shareholders to accept the offer or "risk … being left with nothing."  *Id*. at *7 (citations omitted).

> Even assuming these were the only two options available to preferred shareholders, however, Plaintiff exaggerates the difficulty that preferred shareholders faced in arriving at an informed decision based on the merits of the tender offer.  His theory relies on the false assumption that preferred shareholders were stuck in a 'Prisoner's Dilemma', rendering them incapable of gauging the likelihood that their fellow shareholders would tender their shares.

*Id.*  The Court noted that, "[a]t bottom, although tethering the consent solicitation to the exchange offer may have 'threaten[ed] to reduce economic protections to non-tendering holders, the shareholders, in the aggregate, [were] free to choose' between tendering and refusing to do so." *Id*. (quoting *Gradient OC Master, LTD v. NBC Universal, Inc*., 930 A.2d 104, 122 (Del. Ch. 2007)).  In addition, the Court held that "the tender offer presented no threat of 'retribution' if the consent solicitation failed", and instead, the shareholders knew they had the "option to remain in

their current position." *Id*. (quoting *In re General Motors Class H S'holders Litig*., 734 A.2d 611, 621 (Del. Ch. 1999)).

## C.     Background to the Current Roberts Action

*Current Offer.*   On December 21, 2018, Navios announced that it had commenced the Current Exchange Offer to exchange cash and/or newly issued 9.75% Senior Notes due 2024 (the "Notes") to holders of approximately 66 2/3% of each of the outstanding Series G ADSs and Series H ADSs. *See* Ex. B, 12/21/18 Form F-4 at pp. 3-10.  The Company offered to acquire each Series G ADS for either $4.83 in cash or $5.52 in principal amount of newly issued Notes and each Series H ADS for either $4.77 in cash or $5.46 in principal amount of newly issued Notes.  *Id*.  Those financial terms represented a premium of 40% per share in cash and 60% per share in Notes for the Series G ADSs and Series H ADSs to the closing price of such shares on December 21, 2018. Under the terms of the Current Exchange Offer, no more than 50% of the Series G ADSs and no more than 50% of the Series H ADSs that are tendered would receive cash consideration.  *Id*.  All ADSs tendered in excess of this cash cap would receive Notes.  *Id.*  If the cash cap for one series of ADSs is reached but the cash cap for the other series of ADSs is not, Navios would allocate unutilized amounts to satisfy cash elections in excess of the cash cap for the other series of ADSs, on a pro rata basis.  *Id.*

Similar to the 2016 Offer, Navios announced that it again sought consent to amend and restate the certificates of designation under which the Series G ADSs and Series H ADSs were issued.  *Id.*  The Current Consent Solicitation again proposed amendments that "will eliminate substantially all of the restrictive covenants and [Navios'] obligation to pay or accrue any unpaid dividends for any past periods or future periods and to amend certain voting rights" (the "Proposed

Amendments").[3] *Id*. at p. 52. The Current Offer was initially set to expire on February 1, 2019. *Id*. Also similar to the 2016 Offer, Navios again instituted a Minimum Tender Condition as a condition to closing, requiring the consent of at least 66 2/3% of the holders of outstanding Series G ADSs and Series H ADSs to amend the certificates of designation. *Id.* at pp. 3-10.

**Commencement of the Current Roberts Action.** On January 23, 2019, Plaintiff commenced this lawsuit. Plaintiff's two-count putative class action Complaint, brought on behalf of himself and other preferred holders, asserts claims for breach of fiduciary duty against the Director Defendants. Ex. A, Compl. ¶¶ 90-97.

**Current Exchange Offer Extended and Offer Price Increased.** On February 4, 2019, Navios announced that, as of the scheduled February 1, 2019 expiration date, only **29.6%** of the Series G ADSs and **23.3%** of the Series H ADSs had been validly tendered and not withdrawn. *See* Ex. H, 02/04/19 Press Release. Against this backdrop, Navios extended the Current Exchange Offer until 11:59 PM on February 15, 2019, and increased its offer price to $7.25 in cash and/or $8.28 in principal amount of the newly issued Notes for each Series G ADS surrendered and $7.16

---

[3]     Such amendments include: (1) eliminating the requirement that future unpaid dividends accrue for future payment; (2) eliminating all previously accrued and unpaid dividends on the Preferred Shares and Navios' obligation to pay such accrued and unpaid dividends; (3) amending the restriction on paying dividends on junior securities from (a) being in effect so long as cumulative dividends on the Preferred Shares are in arrears to (b) only be effective in any quarter in which a dividend on the Preferred Shares has not been declared or paid for such quarter; (4) eliminating  the increase of the dividend rate on the Preferred Shares in the event that Navios' Articles of Incorporation are not amended to permit ADS holders to elect a director if and when six or more quarterly dividends are in arrears; (5) eliminating the requirement that, without the affirmative vote or consent of the holders of at least 66 2/3% of each outstanding series of Preferred Shares, voting as a class together with holders of any other parity securities, if the cumulative dividends payable on outstanding Preferred Shares are in arrears, Navios shall not issue any parity securities; and (6) eliminate the requirement that, in the event that full cumulative dividends on the Preferred Shares and any parity securities shall not have been declared or paid and set apart for payment, neither Navios nor any affiliate of Navios may repurchase, redeem, or otherwise acquire any series of Preferred Shares or parity securities or any junior securities, including common stock. Ex. B, 12/21/18 Form F-4, p. 52.

in cash and/or $8.19 in principal amount of the newly issued Notes for each Series H ADS surrendered. *Id.* Those revised financial terms represented a premium of 110% per share in cash and 140% per share in Notes for the Series G ADSs and Series H ADSs to the closing price of such shares on December 21, 2018. *Id.*

*Second Extension and Waiver of Minimum Tender Condition*. On February 19, 2019, the first business day following expiration of the initial extension described above, Navios announced that 569,735 of the Series G ADSs and 1,002,510 of the Series H ADSs were validly tendered in exchange for cash and/or newly issued Notes and not validly withdrawn. Ex. K, 02/19/2019 Press Release. The tendered shares represent approximately *40.1%* of the Series G ADSs and *35%* of Series H ADSs. *See id*. Navios further announced that it extended the expiration date of the Current Exchange Offer through 5:00 p.m. New York City time on March 1, 2019 and waived the Minimum Tender Condition. *Id.* The terms and conditions of the Current Consent Solicitation, however, remained unchanged. *Id.*

*Third Extension and Modification of the Current Consent Solicitation*. On March 4, 2019, the first business day following expiration of the second extension described above, Navios announced that 705,391 of the Series G ADSs and 1,062,573 of the Series H ADSs were validly tendered in exchange for cash and/or newly issued Notes and not validly withdrawn. Ex. L, 03/04/2019 Press Release. The tendered shares represent approximately *49.7%* of the Series G ADSs and *37.1%* of Series H ADSs. *See id*. Navios further announced that it increased the exchange consideration by $0.50 per Series G ADS and Series H ADS and (ii) extended the expiration date of the Current Exchange Offer through 11:59 pm on Friday, March 15, 2019. *Id*. The increased consideration represents a premium of 125% per share in cash and 155% per share in Notes to the unaffected share price at the launch of the Current Exchange Offer. *Id*. Navios

also announced that it withdrew the Current Consent Solicitation with respect to the Series H ADSs. *Id.*

**ARGUMENT**

In order to survive a Rule 12(b)(6) motion to dismiss, a complaint must set forth factual allegations that "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). While a district court must accept all factual allegations in the complaint as true when ruling on such motion, it is free to ignore legal conclusions, and "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action" are insufficient to state a claim. *Id.* at 678.

A court may consider the complaint, documents attached to the complaint or incorporated by reference, matters of which a court can take judicial notice — including documents filed with the SEC — documents possessed by plaintiffs, or documents that plaintiffs knew about and relied upon when bringing their claims. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

**I.     PLAINTIFF'S CLAIMS FOR BREACH OF FIDUCIARY DUTY SHOULD BE DISMISSED BECAUSE PLAINTIFF, A PREFERRED STOCKHOLDER, MERELY INVOKES HIS CONTRACTUAL RIGHTS**

As a threshold matter, the two causes of action in the Complaint fail to allege any wrongdoing against Navios and are only brought against the Director Defendants. The Complaint alleges that the Director Defendants — and not Navios — breached their fiduciary duties in connection with the Current Offer and failure to pay dividends. Ex. A, Compl. ¶¶ 90-97. Thus, the Complaint fails to state a claim against Navios and should be dismissed with respect to Navios.

As to Plaintiff's claims against the Director Defendants, they fail as a matter of law.[4] The

---

[4]     Navios is incorporated under the laws of Marshall Islands, "which in turn incorporates Delaware law." *F5 Capital v. Pappas*, 14 Civ. 9356, 2016 WL 900389, at *4 n.3 (S.D.N.Y. Feb.

Director Defendants did not breach any fiduciary duties to Plaintiff through the Current Exchange Offer and Consent Solicitation or by failure to pay dividends on the Preferred Shares because directors do not owe any fiduciary duties to preferred stockholders when such holders merely invoke their contractual rights. "As a general matter, 'the rights and preferences of preferred stock are contractual in nature.'" *Frederick Hsu Living Trust v. ODN Holding Corp.*, No. 12108-VCL, 2017 Del. Ch. LEXIS 67, at *50 (Del. Ch. Apr. 14, 2017) (quoting *In re Trados Inc. S'holder Litig.*, No. 1512-CC, 2009 Del. Ch. LEXIS 128, at *7 (Del. Ch. July 24, 2009)).

It is well-settled Delaware law that contract law — not any fiduciary duties — determines the propriety of corporate acts "relating to preferences or limitations that distinguish preferred stock from common." *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 594 (Del. Ch. 1986) (finding that, with respect to preferred stockholders, "the scope of the duty [of the corporation and its directors] is appropriately defined by reference to the specific words evidencing that contract[.]"). "Preferred stockholders are owed fiduciary duties *only* when they do not invoke their special contractual rights and rely on a right shared equally with the common stock." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 39-40 (Del. Ch. 2013) (holding that "[a] board does not owe fiduciary duties to preferred stockholders when considering whether or not to take corporate action that might trigger or circumvent the preferred stockholders' contractual rights") (citations omitted).

---

17, 2016); Marshall Islands' Business Corporation Act § 13 ("Insofar as it does not conflict with any other provision of this Act, the non-statutory law of the State of Delaware and of those other states of the United States of America with substantially similar legislative provisions is hereby declared to be and is hereby adopted as the law of the Republic, provided however, that this section shall not apply to resident domestic corporations."); *see* Ex. A, Compl. ¶¶ 79-81.

## A. Plaintiff Cannot State a Claim for Breach of Fiduciary Duty Based on the Current Exchange Offer and Consent Solicitation

Plaintiff's purported breach of fiduciary duty claim arises from and pertains to ***contractual*** rights established in the ADS holders' certificates of designation because the certificates of designation determine the rights of the preferred shareholders in connection with the Current Offer. Accordingly, the breach of fiduciary duty claim based on an allegedly coercive combination of the Current Exchange Offer and Consent Solicitation should be dismissed because it is a matter of contract law, not one of fiduciary duty. *See MCG Capital Corp. v. Maginn*, No. 4521-CC, 2010 WL 1782271, at *15 (Del. Ch. May 5, 2010) ("when preferred shareholders assert fiduciary duty claims that relate to obligations expressly treated by their unique contractual rights with the corporation, the Court will review those claims as breach of contract claims and the claims for breach of fiduciary duty will be dismissed as superfluous"); *HB Korenvaes Invs., L.P. v. Marriott Corp.*, No. 12922, 1993 WL 205040, at *5-7 (Del. Ch. June 9, 1993) ("*HB Korenvaes I*") (holding contract principles control when a preferred stockholder alleges inequitable coercion).

As discussed in Section I.B. below, the actions of the Company and Board of Directors fully comport with the certificates of designation that govern the rights of the Preferred Shares. Plaintiff cannot state a claim for breach of fiduciary duty to a preferred stockholder when no such duties exist.

## B. Plaintiff Cannot State a Claim for Breach of Fiduciary Duty Based on the Failure to Pay Dividends on the Preferred Stock

Plaintiff's claim against the Director Defendants for breach of fiduciary duty in connection with the Board of Directors' decision to suspend dividend payments also fails because the certificates of designation determine the rights of the preferred shareholders. *See supra* Section I.A. Defendants' actions comply with the ADS holders' certificates of designation because the certificates expressly state that preferred shareholders are entitled to receive dividends "when, as,

and if declared by the Board of Directors." *See* Ex. D, Series G COD, Section 3(a); Ex. E, Series H COD, Section 3(a). In other words, Navios' Board of Directors possesses the sole discretion to determine whether to declare dividends. *See* Ex. A, Compl. ¶¶ 40-42.

In fact, the certificates of designation provide strong bargained-for contractual protections and rights to the preferred shareholders in the event dividends are not paid:

- Navios and its affiliates may not redeem, repurchase or otherwise acquire (except in connection with certain tender offers), among other things, any common stock or preferred stock unless full cumulative dividends on the preferred stock for all prior and the then-ending periods shall have been paid or declared and set apart for payment.

- The common stockholders may not be paid any dividends.

- The prolonged suspension of dividends gives preferred shareholders the right either to elect one director (if Navios' charter documents are amended to provide for such an election) or, alternatively, an increase in the dividend rate by 25 basis points.

- The dividends are cumulative (to account for any unpaid dividends) and enjoy liquidation preferences — ahead of the common stock — in the event a Liquidation Event occurs (*e.g.*, a dissolution or a wind up of the Company).

- The redemption price of $25 per Series G ADS is adjusted upwards to include unpaid dividends.

*See* Ex. D, Series G COD, Ex. E, Series H COD.

Just as the certificates of designation contain these contractual protections in the event dividends are not paid, the Company has the contractual right to refrain from declaring dividends. *See HB Korenvaes Invs., L.P. v. Marriott Corp.*, No. 12922, 1993 WL 257422, at *12 (Del. Ch. July 1, 1993) ("*HB Korenvaes II*") ("[C]ontractual protections are a recognition of the risk that dividends might not be paid currently. These protections are substantial. The correlative of the fact that [the company] has a duty to respect them is the conclusion that it has a right to discontinue dividends when it observes them.").

Ultimately, the certificates of designation govern the rights of the ADS holders and, as such, Plaintiff cannot state a claim against Defendants for breach of any fiduciary duties. Counts I and II of the Complaint should be dismissed.

## II. EVEN ASSUMING ARGUENDO THAT FIDUCIARY DUTIES ARE IMPLICATED, NEITHER THE CURRENT OFFER NOR THE BOARD'S FAILURE TO PAY DIVIDENDS IS IMPROPERLY COERCIVE

Even assuming that fiduciary duties are somehow implicated (they are not), Plaintiff's refrain that the Current Offer is "coercive", *e.g.*, Ex. A, Compl. ¶¶ 73-78, is mere pejorative rhetoric that need not be credited by the Court. *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). Plaintiff's claims are foreclosed by thirty years of controlling precedent. The Current Offer is fully consistent with the rights and limitations that Plaintiff bargained for in his certificate of designation. The fact that certain attributes of the Current Offer might make one option or another more compelling does not make the choice an unlawful one.

### A. The Current Offer's Transaction-Based Incentives and the Board of Directors' Suspension of Dividends Do Not Constitute Inequitable Coercion

Delaware cases consistently distinguish between the legitimate coercion that is inherent in offering shareholders a choice between two alternatives, one of which may be economically superior to the other, and "wrongful" or "inequitable" coercion, which involves the use of some extrinsic factor unrelated to the merits of the transaction in an attempt to influence the shareholders' decision. *See Ivanhoe Partners v. Newmont Mining Corp.*, 533 A.2d 585, 605 Del. Ch. 1987), *aff'd*, 535 A.2d 1334 (Del. 1987) ("To establish a claim for actionable coercion,

plaintiffs must show that the selling shareholders were wrongfully induced … to sell their shares for reasons unrelated to the economic merits of the sale.") (citations omitted).

Delaware courts have found that no actionable coercion exists in a number of circumstances.  "An offer that is economically 'too good to resist' as compared to the alternative of not tendering, would not, for that reason alone, be actionably coercive." *Weiss v. Samsonite Corp.*, 741 A.2d 366, 372 (Del. Ch. 1999) (citations omitted); *accord Cantor Fitzgerald, L.P. v. Cantor*, No. 18101, 2001 WL 1456494, at *9 (Del. Ch. Nov. 5, 2001) (no improper coercion despite "compelling economic incentives" for participating in exchange offer).  Nor does taking full advantage of the governing contractual agreements to create suitable "carrots and sticks" give rise to a claim of wrongful coercion.  *See In re Gen. Motors*, 734 A.2d at 620 (structuring deal to avoid triggering an enhanced benefit under the certificate of incorporation does not amount to improper coercion).

Further, a risk that a governing agreement will be amended in accordance with its terms to eliminate certain protections does not support a claim for wrongful coercion. *Cantor Fitzgerald*, 2001 WL 1456494, at *9.  In addition, although "suspension of dividends may exert a powerful influence upon the decision whether holders of preferred stock will exercise [their] rights to convert or not," if the suspension is consistent with the certificate of designation, no claim of wrongful coercion will lie.  *HB Korenvaes II*, 1993 WL 257422, at *12-13.

Conversely, courts have found "'wrongful coercion'" when "the board or some other party takes actions which have the effect of causing the stockholders to vote in favor of the proposed transaction for some reason other than the merits of the transaction." *Cantor Fitzgerald*, 2001 WL 1456494, at *9 (citations omitted); *Weiss*, 741 A.2d at 372; *Ivanhoe*, 533 A.2d at 605.  It was precisely such an extrinsic factor that tipped the scales in *Eisenberg v. Chicago Milwaukee Corp.*,

537 A.2d 1051 (Del. Ch. 1987). In *Eisenberg*, the Court rejected the suggestion that a self-tender was "inequitably" coercive because of, among other things, the board's policy of not paying dividends despite the company's alleged ability to do so:

> Preferred stockholders may perceive, not unreasonably, that unless they tender, they may not realize any return on or value for their investment in the foreseeable future. In that sense the offer does have coercive aspects…. If these were the only relevant circumstances (and if proper disclosure was made of all material facts) the Court would have difficulty concluding … that the Offer is inequitably coercive.

*Id.* at 1061.

What did, however, make the offer in *Eisenberg* "inequitably coercive" was the directors' expressed intention to proactively request delisting of non-tendered shares from the NYSE even though delisting was not required, thereby depriving shareholders of the ability to monetize their investment. *Id.* at 1062. Similarly, in *Lacos Land Co. v. Arden Group, Inc.*, 517 A.2d 271, 277-79 (Del. Ch. 1986), the court found wrongful coercion in a threat from the company's controlling stockholder that he would oppose ***other*** transactions that were in Arden's best interests, both as a stockholder and as an officer and a director, if the shareholders did not vote his way. As then-Vice Chancellor Strine noted, "in each case the electorate was told that retribution would follow if the proposed transaction was defeated." *In re Gen. Motors*, 734 A.2d at 621.

Here, Plaintiff contends that the Current Offer is actionably coercive because: (i) the Board suspended payment of dividends on the Preferred Shares, Ex. A, Compl. ¶ 42, (ii) refused to pay dividends even after market conditions supposedly improved, *id.* ¶¶ 50-52, and (iii) launched the Current Offer, which essentially told ADS holders they can tender their shares and accept less consideration than the amount of accrued dividends to receive at least some payment from Navios, or risk losing various rights, including the right to unpaid dividends, in the future, *id.* ¶ 64. Even if, however, the Current Offer is one that is "economically 'too good to resist' as compared to the

alternative of not tendering" because tendering shares ensures that an ADS holder will receive at least some compensation from Navios, economic enticement is still not actionable coercion. *See Weiss*, 741 A.2d at 372 (citations omitted).

Applying the Court's reasoning in *Eisenberg*, absent an external factor unrelated to the deal — like threats from the board of directors in *Eisenberg* to delist remaining securities — the Current Offer is not inequitably coercive. *See also HB Korenvaes II*, 1993 WL 257422, at *12-13. Indeed, the *Eisenberg* court drew an important distinction between impermissibly "threatening" delisting and acknowledging the possibility of delisting, stating:

> defendants have done *more than simply acknowledge the possibility* of delisting and deregistration; they have told the Preferred stockholders that [the company] '*intends to request delisting* of the Shares from the NYSE.' *It is that disclosure which tips the balance* and impels the Court to find that the Offer, even if benignly motivated, operates in an inequitably coercive manner.

537 A.2d at 1062 (emphasis added).

Tacitly recognizing that the Current Exchange Offer and Consent Solicitation do not entail any coercion, Plaintiff alleges that Navios has "threatened ADS holders." Plaintiff's assertions are directly contradicted by the plain language of both the Complaint and Navios' SEC filings. Plaintiff asserts that Navios "threatened ADS holders" that if a sufficient number of ADSs are tendered, the remaining ADSs may be delisted from the NYSE and the amendment may be treated as a taxable distribution by the IRS. Ex. A, Compl. ¶ 66.[5] Not so. In compliance with its

---

[5]    Plaintiff made the same allegation of coercion in the First Roberts Action. (Ex. P., Compl., No. 16 CIV. 7860 ¶ 57) ("Moreover, in SEC filings setting forth the Exchange Offers and Consent Solicitations, Holdings threatened the ADS holders by stating that if a sufficient number of their fellow holders tender their shares, the ADS shares may be delisted from the NYSE, thus further hampering their liquidity and value. Finally, Holdings also threatened ADS holders into tendering by stating that if a sufficient number of holders tender, the IRS may treat the amendment of the Certificates of Designation as a distribution subject to federal taxes."). The Court, however, did not credit his assertion.

obligations under the federal securities laws, Navios merely cautioned ADS holders of these potential risks, which is not coercive under *Eisenberg*. To the contrary, Navios has neither "threatened" delisting, nor announced (or even suggested) that it intends to seek the delisting of the Preferred Shares. Navios has simply disclosed the risk — as it must — that, by operation of law, the NYSE may delist Navios' Preferred Shares if the number of outstanding Series G ADSs and Series H ADSs falls below the requirement for such listings. *Eisenberg*, 537 A.2d at 1062; *see* Ex. B, 12/21/18 Form F-4, p. x ("In addition the liquidity of the Series G ADSs and Series H ADSs will be reduced and the Series G ADSs or the Series H ADSs also may be delisted from the NYSE if the number of outstanding Series G ADSs and/or Series H ADSs falls below the requirement for such listings."). In short, Navios has not threatened ADS holders.

Plaintiff also asserts that the Director Defendants "maintain their threat that ADS holders will receive no dividend payment whatsoever if the Exchange Offer fails." This assertion is contradicted by the very disclosure Plaintiff cites. *See* Ex. A, Compl. ¶ 67. Plaintiff alleges that "[t]he prospectus for the Exchange Offers and Consent Solicitations informs ADS holders that the Company 'currently [has] no plans or intents to pay dividends[.]'" *Id*. But in fact, the plain reading of this disclosure indicates that *irrespective* of the success or failure of the Current Exchange Offer, Navios does not intend to pay dividends.

Further, as detailed above, the Director Defendants' failure to pay dividends on the ADSs does not amount to actionable coercion. In the First Roberts Action, the Court determined that the ***same*** Navios Board of Directors' dividend policy was not inequitably coercive. In so holding, the Court was persuaded by *Eisenberg's* rationale and stated, "even though Navios had failed to pay dividends for two quarters preceding the tender offer and was expected to miss a third quarter, the preferred shareholders' ability to refuse to tender and remain in the same position availed the

various remedies embedded in the Certificates of Designation for Navios's failure to pay dividends." *Roberts*, 2017 WL 4286321, at *7 (citing *Eisenberg*, 537 A.2d at 1061-62).[6]  Once again, two years later, Navios presented ADS holders with the same choice.  Judge Failla's reasoning should apply here as well.

### B.    The Current Offer Represents a Real Economic Choice

As detailed above, the Complaint is devoid of any allegation that "the electorate was told that retribution would follow if the proposed transaction was defeated."  *In re Gen. Motors*, 734 A.2d at 621.  Indeed, the exact opposite is true; the ADS holders were given the option of saying no and thus maintaining the status quo.  *See id.* ("stockholders had the freedom to choose between the status quo and the deal consideration.  Having had that freedom, they must live with their decision.").  The Current Offer presented Plaintiff and other ADS holders with two options.  They could tender their ADSs, thereby obtaining liquidity and a material premium for their investment or, alternatively, retain their ADSs and thus maintain the status quo.  Their decision was — as a matter of law — a merits-based economic choice.  Even though Plaintiff "might not *prefer or like* ... [his] choices," the fact that he was presented with viable economic choices "does not create coercion." *Gradient OC Master, Ltd. v. NBC Universal, Inc.*, 930 A.2d 104, 115 (Del. Ch. 2007) (plaintiffs lacked a reasonable likelihood of succeeding on their claim that a board's requirement that preferred stockholders tendering into an exchange offer also consent to elimination of certain

---

[6]     As detailed above, the defendant company in *Eisenberg* had the financial ability to pay dividends, but the court did *not* find that its ability to do so results in a finding of inequitable coercion.  *Eisenberg*, 537 A.2d at 1061.  Even if such ability was dispositive, Plaintiff fails to factually allege that Navios has the present ability to pay accrued and future dividends, and instead, makes general self-serving allegations regarding the condition of the bulk shipping market and the Company itself.  *See* Ex. A, Compl. ¶¶ 50-52.  Notably, the Complaint makes no mention of the fact that by the time Navios launched the Current Offer in December 2018, the market capitalization of Navios had fallen **77%** since the commencement of the 2016 Offer.  *See above* at "Factual Background," Section A.

existing rights of their preferred stock was actionably coercive); *Cantor Fitzgerald*, 2001 WL 1456494, at *9 (no improper coercion despite "compelling economic incentives" for participating in exchange offer).

Just as in 2016, the Current Offer "present[s] no threat of 'retribution' if the consent solicitation fail[s] to pass; much to the contrary, the shareholders ha[ve] an 'option to remain in their current position[.]'" *Roberts*, 2017 WL 4286321, at *7. In the absence of any threatened extrinsic retribution (which, as detailed in Section II.A., does not exist here), the ADS holders, like the plaintiffs in *Gradient*, retained the ability to make a "purely economic decision" about whether to tender their shares or retain them and endure the possible removal of certain rights. *See* 930 A.2d at 116, 123-24. Thus, there is no basis whatsoever to find that the Current Exchange Offer and Consent Solicitation are actionably coercive.

In fact, the results of the Current Exchange Offer and Consent Solicitation confirm that there was no actionable coercion. As in the First Roberts Action:

> [t]he paltry participation percentages relative to the requisite two-thirds participation underscore the view that the shareholders knew that it would be economically feasible to hold their position and were not overly concerned with a mass exodus of other tendering shareholders. At bottom, although tethering the consent solicitation to the exchange offer may have 'threaten[ed] to reduce economic protections to non-tendering holders, the shareholders in the aggregate, [were] free to choose' between tendering and refusing to do so.

*Roberts*, 2017 WL 4286321, at *7 (citations omitted). By definition, a solicitation cannot be unduly coercive if it fails — and as of the filing of this motion, the Current Consent Solicitation for the Series H ADSs has irretrievably failed (and was withdrawn) and for the Series G ADSs has already failed three times. *See H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 151 (Del. Ch. 2003) (stockholder who refused to participate in the challenged transaction "was conclusively not coerced").

### C.    Coupling the Current Exchange Offer with the Current
####       Consent Solicitation is Not Coercive

The linking of the Current Exchange Offer to the Current Consent Solicitation cannot save

the Complaint from dismissal.  The Proposed Amendments to the certificates of designation would,

as noted above, only take effect if approved by 66 2/3% of the Series G ADSs and Series H ADSs.

Nevertheless, as in the First Roberts Action, Plaintiff again alleges that the coupling of the Current

Exchange Offer with the Current Consent Solicitation is inequitably coercive.  The Court in its

2016 Decision and Order, however, rejected that contention:

> [T]he requirement that shareholders had to tender two-thirds of the shares in both
> categories of preferred stock to effect the consent solicitation would bolster any
> rational economic estimate of the likelihood of the consent solicitation passing.
> Indeed, the shareholders could assess, in the first instance, whether the
> consideration offered was desirable, and, if so, the likelihood that other
> shareholders would arrive at the same conclusion.  Although the preferred
> shareholders may not have been able to account for every one of their fellow
> shareholders' votes before the tender offer closed, *tying the consent solicitation to
> the exchange offer did not require the preferred shareholders to arrive at a decision
> detached from the "economic merits" of the tender offer as a whole.*

*Roberts*, 2017 WL 4286321, at *7 (emphasis added).

The use of exit consents is a well-recognized and legitimate exercise of contractually

bargained-for rights.  As with any contractual instrument that may be amended by a supermajority

vote, the ADS holders were always at risk that 66 2/3% of their peers may take action that left

certain holders, against their wishes, owning a security whose rights were altered.  The ADS

holders knowingly assumed that very contractual risk when they acquired their securities.

Delaware courts routinely reject clams that the use of an exit consent amounts to improper

coercion.  *See, e.g.*, *Gradient*, 930 A.3d at 122 (holding that the elimination of preferred rights was

"merely an effect of the reality that a majority of the [preferred shareholders'] peers have disagreed

with the non-tendering shareholders and concluded that accepting the Exchange offer is in their

best interest"); *Cantor Fitzgerald*, 2001 WL 1456494, at *9 (conditioning the participation in an

exchange offer upon approval of amendments to partnership agreement was not actionable coercion); *Gen. Motors*, 734 A.2d at 615-16 (coupling opportunity to participate in a transaction with a vote to waive protections in the certificate of incorporation was not inequitably coercive; rights were always subject to amendment by shareholder vote); *In re Marriott Hotel Props. II Ltd. P'ship Unitholders Litig.*, No. 14961, 2000 WL 128875, at *18 (Del. Ch. Jan. 24, 2000) (holding it was not wrongfully coercive to condition tender offer on obtaining sufficient approvals for allegedly unfair amendments to partnership agreement); *Katz v. Oak Indus., Inc.*, 508 A.2d 873, 880-81 (Del. Ch. 1986) ("fashion[ing] the exchange offer and consent solicitation in a way designed to encourage consents" not inequitably coercive). Plaintiff's attempt to re-cast the exercise of an express provision permitting amendment by supermajority vote as a punishment of the minority is untenable as a matter of law. Three decades of unbroken case law squarely reject Plaintiff's challenge to the use of exit consents and the notion that an expressly permitted amendment can be wrongfully coercive. There is no basis to depart from that authority here.

## III. PLAINTIFF'S CLAIMS BASED ON ALLEGED COERCION AS TO THE SERIES H PREFERRED SHARES SHOULD BE DISMISSED AS MOOT

As detailed throughout this brief, the Complaint should be dismissed because Defendants owe no fiduciary duty to Plaintiff and breached no such (non-existent) fiduciary duty. Plaintiff's claims based on alleged coercion of Series H ADSs holders should also be dismissed for an additional, independent reason — namely, on March 4, 2019, Navios withdrew the Current Consent Solicitation as to the Series H ADSs. Plaintiff premises his entire theory of coercion upon Navios seeking consent to amend the governing certificates of designation to eliminate certain rights of the Preferred Shares. Because such consent is no longer sought from the Series H ADS holders, Plaintiff's claims (Counts I and II) as to the Series H ADSs should be dismissed as moot.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss should be granted in its entirety and the Complaint should be dismissed with prejudice.

Dated:    New York, NY
          March 6, 2019

Respectfully submitted,

FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP

By:        /s/ Israel David
            Israel David

Israel David
Justin J. Santolli

One New York Plaza
New York, New York 10004-1980
(212) 859-8000
israel.david@friedfrank.com

*Attorneys for Defendants*